# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:19-cr-118 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| LUIS TAPIA, | : | |
| | : | |
| Defendant. | : | |

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

This criminal case is before the Court on Defendant's motion to suppress (Doc. 26) and the parties' responsive memoranda (Docs. 27, 28).

On August 4, 2021, this Court held an evidentiary hearing on Defendant's motion, at which time the Court heard the testimony of the Government's witness, Norwood Police Officer Ryan Harrison, as well as Defendant's witnesses, Special Agent Jason Greer of the Department of Homeland Security, and Investigator Kara Killen of the Federal Public Defender's Office. (Min. Entry, Aug. 4, 2021). The Court also ordered the preparation of a transcript (Doc. 29) and subsequently received post-hearing briefs from the parties (Docs. 30, 32, 33). The motion is now ripe for decision.

## I. BACKGROUND

On September 25, 2019, Defendant Luis Tapia was charged by way of a single-count Indictment with reentry of a removed person, in violation of 8 U.S.C. § 1326(a), (b)(1). (Doc. 16). On October 23, 2019, the grand jury returned a Superseding Indictment, to include the unlawful reentry charge (Count 1) and two additional charges: possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1),

(b)(1)(A) (Count 2); and possession with intent to distribute cocaine, in violation of 21

U.S.C. § 841(a)(1), (b)(1)(C) (Count 3). (Doc. 20).

The two drug charges arise from evidence seized during two warrantless searches

conducted at Defendant's place of residence—4613 McNeil Avenue, Norwood, Ohio

("4613 McNeil"). (Doc. 26 at 2-4). Specifically, the first search resulted in the seizure of

the controlled substances charged in Counts 2 and 3, and the second search resulted in the

seizure of Defendant's cellular telephone. Defendant states that law enforcement later

relied upon the warrantless drug seizure to obtain a warrant to search the contents of his

cell phone. Accordingly, Defendant moves for suppression of the evidence, arguing that

the first search was conducted without the benefit of a warrant and in violation of his

Fourth Amendment rights, and that the evidence obtained as a result of the second

search—*i.e.*, the cell phone and its contents—is fruit of the poisonous tree. (*Id*. at 5-7).

For purposes of this Order, the Court will rely upon as well as the testimony and

evidence proffered at the August 4, 2021 suppression hearing. (Doc. 29).[1] The Court

---

[1] The parties stipulated to the admission of all exhibits. The Government's exhibits include: an audio recording of the 911 call that prompted Officer Harrison's visit to 4613 McNeil (Gov. Ex. 1); and Officer Harrison's body-worn camera footage (Gov. Ex. 2). Defendant's exhibits include: Officer Harrison's body-worn camera footage (Def. Ex. A); a post-arrest investigative report (Def. Ex. B); Defendant's arrest warrant and criminal complaint (Def. Ex. C); 20 investigative photos of the exterior of 4613 McNeil (Def. Ex. D); three investigative photos showing an interior view of the window and rooftop area from which the duffel bag was seized (Def. Ex. E); and one exterior photo of 4613 McNeil, as well as two consent search photos, depicting the location from which Defendant's cell phone was seized (Def. Ex. F). After the hearing, the Court also requested and received from the parties a copy of the affidavit and search warrant authorizing the search of Defendant's cell phone. For purposes of this Order, the Court treats the affidavit and search warrant as a jointly admitted exhibit. The parties' exhibits have not been electronically filed on the docket, but are part of the record and remain in the Court's custody.

will also rely upon the facts set forth in the parties' pre- and post-hearing briefs (Docs. 26, 27, 28, 30, 32, 33), to the extent said facts are supported by the evidence of record.

## II. FACTS

On September 11, 2019, law enforcement obtained a warrant to arrest Defendant for violation of 8 U.S.C. § 1326—unlawful reentry of a previously removed person. At approximately 6:10 a.m. on September 13, 2019, Detroit Enforcement and Removal Operations Special Response Team ("SRT"), along with investigators from the Cincinnati Police Department ("CPD") and the Department of Homeland Security ("DHS"), executed the arrest warrant at Defendant's residence, located at 4613 McNeil in Norwood, Ohio. Defendant resided at 4613 McNeil with Bria Gore (the mother of his children) ("Ms. Gore"), as well as Ricky Gore (Ms. Gore's brother) ("Mr. Gore"), Paula Warren (Ms. Gore and Mr. Gore's mother) ("Ms. Warren," collectively with Ms. Gore and Mr. Gore, the "co-residents"), and at least two minors.

Upon arrival at 4613 McNeil, law enforcement officers positioned themselves around the property and in the backyard. At that time, unidentified SRT officers, who were positioned in the backyard, "observed [Defendant] approach the rear second floor window," in what the observing officers described "as an apparent attempt to escape." (Def. Ex. B at 5). An SRT officer then commanded Defendant to stop and show his hands, at which point Defendant retreated away from the window. Defendant was subsequently found hiding in a closet inside the home, at which time Defendant was arrested and transported to the Cincinnati Immigration and Custom Enforcement office. By approximately 7:00 a.m., law enforcement had completed the arrest and left the scene.

Less than an hour after Defendant's arrest, one of Defendant's neighbors called 911 to report a red duffel bag on the roof of 4613 McNeil and suggested that the police may want to come and retrieve it. (Gov. Ex. 1). The 911 caller also advised that a "raid" had occurred at the home earlier that morning and that "there's been a lot of drug dealing on this street." (*Id.*) Officer Ryan Harrison of the Norwood Police Department was dispatched to 4613 McNeil in response to the 911 call, arriving at around 7:51 a.m. (*i.e.*, approximately one hour <u>after</u> law enforcement had cleared the scene following Defendant's arrest).[2]

Upon his arrival at 4613 McNeil, Officer Harrison walked up to the property and entered the backyard via a side gate to see if he could locate the red duffel bag. As he was walking in the backyard, Ricky and Bria Gore came out of the home. Ricky Gore approached, and Officer Harrison stated that he received a report of "suspicious property" on the roof. (Harrison, 01:35-02:40).[3] Mr. Gore stated that he knew nothing about it.

---

[2] The Court has determined Officer Harrison's arrival time and his shift schedule based on the evidence. On the body camera video, Officer Harrison tells the residents that he had just come on shift minutes before being dispatched to 4613 McNeil and that he had not been on duty the night before. During the suppression hearing, Officer Harrison testified that he could not recall what time he started his shift on September 13, 2019, but that he typically starts at 7:00 a.m. (Doc. 29 at 12). Officer Harrison further testified that 7:52 a.m. was likely an accurate estimate of his arrival time. (*Id.* at 12-13). Additionally, the clock in Officer Harrison's cruiser is visible on the body camera footage, displaying the time of his arrival as 7:51 a.m. (Harrison, 00:15). Regardless of the specific time, it is abundantly evidenced that Officer Harrison was not on duty until after Defendant was arrested and law enforcement had cleared the scene.

[3] During the suppression hearing, both parties admitted identical copies of Officer Harrison's body camera footage into evidence. (Gov. Ex. 2 and Def. Ex. A). For purposes of this order, citations to the body camera footage will appear with the name of the officer (Harrison), followed by the approximate minute and second timestamp.

Officer Harrison then explained that one of the neighbors had called 911 and that he was told there was "something with a gun run here last night with shots fired" and that there is now a red bag on the roof.  (*Id.*)[4]  Mr. Gore stated that he knew nothing about a report of shots fired from the night before, but stated that law enforcement had been at the home and arrested Defendant just an hour earlier that morning.  Mr. Gore did not advise Officer Harrison of the reason for Defendant's arrest, nor is there any evidence to suggest that any of the co-residents knew the specific reason for Defendant's arrest.  Mr. Gore further noted that law enforcement had used flashbangs during the arrest, leading Officer Harrison to conclude that the neighbors had mistaken the flashbangs used during Defendant's arrest for gunfire.  (*Id.* at 02:11 & 07:41).  Officer Harrison also stated definitively at that time (and on <u>several</u> additional occasions during the remainder of the video) that he knew nothing about Defendant's arrest that morning, that he had no involvement in the investigation, that he had just come on duty a few minutes before being dispatched to 4613 McNeil, and that he was simply responding to a 911 call about a red duffel bag.

After their initial exchange, Officer Harrison asked Mr. Gore to accompany him into the fenced-in backyard to see if they could spot the duffel bag.  Although initially unable to locate the bag, Officer Harrison was ultimately able to spot it while he was

---

[4] The Court has no evidence before it regarding whether there was actually an unrelated incident of shots fired elsewhere in the neighborhood the night before.  However, Officer Harrison stated on the body camera footage that he was not on duty the previous night and he appeared generally skeptical that anyone had actually heard gunshots.  And, notably, the 911 caller never mentioned gunfire during the 911 call.  Thus, it would seem the 911 caller's description of a "raid" that morning was mistakenly relayed to Officer Harrison as a report of shots fired the night before.

standing at the far-end of the backyard.  Specifically, the duffel bag was located on a

portion of the roof that protruded out below a second-floor rear window of 4613 McNeil

(later identified as Mr. Gore's bedroom window).

Notably, although Officer Harrison, and eventually Mr. Gore, were able to see the

duffel bag from their vantage point in the far corner of the backyard, the duffel is never

visible on the body camera footage.  Based on the angle and view from the body camera,

the fact that the duffel cannot be seen on the footage indicates that the bag's placement

was very close to, if not directly below, the window (*i.e.*, the bag had been dropped or

placed immediately below the window).  And the testimony during the suppression

hearing also supports the finding that the duffel was "not thrown or tossed out onto the

roof but placed straight down."  (Doc. 29 at 37).[5]

After spotting the duffel bag on the roof, Officer Harrison and Mr. Gore began to

walk out of the backyard, at which time Officer Harrison asked Mr. Gore: "Can we go

see what that bag is?"  (Harrison, 04:22).  Mr. Gore said, "Umm," and then turned his

attention away from Officer Harrison and walked toward his mother, Ms. Warren, who

had emerged from the house and was now standing in the side yard next to Ms. Gore.

---

[5] During the suppression hearing, the defense's investigator, Kara Killen, testified that she visited
4613 McNeil in November 2019 to take photographs and then returned in October 2020 to
conduct an experiment to determine the placement of the bag.  (Doc. 29 at 36-37).  She testified
that, during her November 2019 visit, she spoke with Mr. Gore (who ultimately retrieved the bag
from the roof) regarding the bag's precise location.  (*Id.* at 39).  Mr. Gore indicated that when he
retrieved the bag, it was placed immediately below the window, *i.e.*, not thrown out and away
from the window.  (*Id.* at 37, 39)  Thus, the Court's observation of the bag's location (based on
the body camera footage), aligns with Mr. Gore's recollection, as relayed to Investigator Killen.

(*Id*. at 04:26).  In short, Mr. Gore did not respond to Officer Harrison's request, nor did Mr. Gore consent to retrieve or inspect the bag for Officer Harrison.

Mr. Gore approached Ms. Warren and advised her that there is a bag on the roof outside of the window.  Ms. Warren initially began to ask a follow-up question about the bag before telling Mr. Gore to just go inside and retrieve it.  (*Id*. at 04:34).  Notably, while Ms. Warren instructed her son (Mr. Gore) to get the bag from the roof, Ms. Warren did not ask Officer Harrison to accompany him, nor did she state that she would consent to Officer Harrison taking immediate possession of or searching the bag.  Additionally, when Ms. Warren told Mr. Gore to "get the bag," Ms. Gore responded by stating, in Officer Harrison's presence, "I wonder if it's his [(*i.e.*, Defendant's)] clothes."  (*Id*. at 04:37).  Notably, Ms. Gore did not specify to whom "his" referred, nor did Officer Harrison ask.

Mr. Gore then proceeded to walk into the house, and Officer Harrison followed behind him.  Upon seeing Officer Harrison walking into the house, Ms. Warren asked Officer Harrison: "You going with him?"  (*Id*. at 04:39).  Officer Harrison definitively responded: "Yeah, I'll go with him."  (*Id*.)  In other words, Officer Harrison did not ask for permission to enter 4613 McNeil, nor did any of the co-residents affirmatively consent to his entry, nor were the co-residents advised of their right to refuse Officer Harrison entry into their home.  Rather, Officer Harrison independently elected to follow Mr. Gore into the home, without invitation or consent.  And, even when a co-resident questioned Officer Harrison's intended entry into the home, Officer Harrison did not stop

or hesitate—he matter-of-factly responded that he <u>will</u> follow Mr. Gore to retrieve the bag, at which point none of the co-residents stopped him.

Once upstairs, Mr. Gore approached the second-floor rear window and climbed out onto the roof to retrieve the bag.[6]  (Harrison, 5:06).  When Officer Harrison cautioned Mr. Gore not to hurt himself, Mr. Gore responded that he used to go out onto the roof when he was a child.  (*Id*. at 5:10-5:16).

After Mr. Gore was on the roof, he picked up the bag and pushed it through the open window, at which point Officer Harrison took possession of it.  While Mr. Gore was still climbing back into the house, Officer Harrison turned to face Ms. Gore (who was

---

[6] The state of the window is relevant to the legal analysis in this Order—particularly as it relates to whether Defendant intended to distance himself from the bag, whether he intended to conceal the bag, or whether he dropped the bag in an effort to flee or resist arrest.  Thus, the Court has thoroughly analyzed the evidence, including Officer Harrison's body camera footage, as well as the investigative photographs of the room, window, and property, and the Court's observations, based solely on the evidence before it, are as follows:

The window in question consisted of two panes stacked vertically, such that, by all appearances, the window should open by pulling the bottom pane up.  However, the window in question did not open correctly and had therefore been opened by pushing out the top pane.  This is evidenced in the defense's investigative photos from November 2019, which show the windowpane still lying on top of the roof.  (Def. Ex. E at 2, 3).  Ultimately, because of the way the window was opened, and given the distance between the window opening and the rooftop, Mr. Gore was not able to retrieve the bag from the roof by simply reaching out of the window—he had to climb out onto the roof in order to access the duffel.  Thus, as seen on the body camera footage, to retrieve the bag, Mr. Gore (who is young and appears to be of average height and build) needed to climb up onto the windowsill, boost himself over the still-intact bottom pane and through the opening (where the top pane was located before being removed), then lower himself onto the roof, using two hands to brace himself at all times.  (Harrison, 5:06-5:39).  Once on the roof, Mr. Gore picked up the bag and pushed it into the house through the top pane opening (which opening was roughly a few inches above Mr. Gore's head), thereby freeing his hands to climb back into the house.  (*Id*.)  In short, the evidence shows that climbing in or out of the window required a fair degree of physicality and would likely be an inordinately difficult task for anyone to attempt while also clutching onto a duffel bag.  Indeed, it would be simpler (and far more logical) for anyone climbing in or out of the window with a duffel bag to push the bag through first, and then climb through after (just as Mr. Gore did).

8

now standing in the bedroom's doorway) and Officer Harrison began to walk out of the bedroom, with the duffel bag in hand.  As he walked out, Officer Harrison asked: "Do you want to step outside and see what's in this thing [the bag]?"  (*Id*. at 5:46).  None of the co-residents responded, but simply followed Officer Harrison back outside to the front of the house.

After exiting the home, Officer Harrison stopped immediately outside the front door, where he was joined by Ms. Gore, Ms. Warren, and eventually Mr. Gore as well. Officer Harrison then asked the co-residents: "Is there anything strange that would be in this bag?" (Harrison, 06:23).  Ms. Gore responded: "We have no idea; that's not our bag—that is his [(*i.e.*, Defendant's)] bag." (*Id*. at 06:26).  Again, Ms. Gore did not specify to whom "his" referred, nor did Officer Harrison ask.  Rather, Officer Harrison simply stated: "That's fine; I just want to ask before I open it." (*Id*. at 06:33).  At that time, Officer Harrison placed the duffel bag on the ground, unzipped the top, and began manipulating the outside of the bag to observe its contents.

The bodycam footage shows that, upon initially opening the bag, the only visible content included some articles of clothing, a blue blanket, and two sticks of deodorant. (*Id*. at 06:44).  After Officer Harrison began shifting the bag around to better view its contents, the edges of a plastic bag appear buried in the corner of the duffel, along with two additional sticks of deodorant.  (*Id*. at 06:46).  From the body camera footage, the contents of the plastic bag do not appear to be visible.  And, indeed, when Officer Harrison ultimately removes the plastic bag from the duffel, the body of the plastic bag appears to be tightly wrapped in aluminum foil, with nothing but the top edges of the

plastic bag, tied in a knot, protruding out from the foil wrapping. (*Id.* at 09:18). However, during the suppression hearing, Officer Harrison testified that he was able to see what appeared to be a white substance inside the bag. (Doc. 29 at 20).[7]

Officer Harrison then searched through the duffel bag and inspected the contents more meticulously, including opening the deodorant packages and unfolding clothing and checking the pockets. In searching the duffel, Officer Harrison found a number of baggies containing suspected drugs.

As the search continued, Ms. Gore, Mr. Gore, and Ms. Warren repeatedly denied ownership and disclaimed all knowledge of the duffel bag and its contents. In response, Officer Harrison told the co-residents that he believed them, and explained that they would not have been so cooperative with him if they had known what the bag actually contained.

---

[7] Officer Harrison was asked: "[W]hen you opened the bag, unzipped it, you said you saw drugs. Did you see actual drugs or the top of a plastic bag or foil? What did you see when you first unzipped the bag?" (Doc. 29 at 20). Officer Harrison responded: "It was a plastic bag that appeared to have a white substance in it." (*Id.*) As the Court previously noted, however, the foil-wrapped plastic bag was not visible on the body camera footage when the duffel was <u>first unzipped</u>. Therefore, Officer Harrison's description of the plastic bag must be in reference to his observations at some point after he began to manipulate and ultimately search the duffel. Additionally, Officer Harrison did not specify how he was able to see the contents of the plastic bag (for instance, that a portion of the content was visible from the top of the plastic), nor did he mention the aluminum foil wrapping. In that regard, it bears noting that, at the bottom of the duffel, below layers of clothing, Officer Harrison also located a second plastic bag containing a white substance. Notably, the second plastic bag was not wrapped in aluminum foil, and thus the white substance was unquestionably visible once the second plastic bag was uncovered. Moreover, although Officer Harrison *located* the second plastic bag <u>after</u> he located the foil-wrapped bag, Officer Harrison *removed* that second plastic bag from the duffel <u>before</u> he removed the foil-wrapped bag. Thus, while the Court does not doubt that Officer Harrison testified regarding his observations in good faith, the Court merely notes that Officer Harrison's description of the plastic bag containing a white substance appears to align more with a description of the second plastic bag that he found after the clothes were removed.

After the search was complete, Officer Harrison advised the co-residents: "[J]ust so we're all on the same page, this bag and everything that was in it … is coming back with me, okay?" (Harrison, 11:15). None of the co-residents objected. Officer Harrison then confiscated the bag and left the residence.

After leaving 4613 McNeil, Officer Harrison delivered the duffel bag to the law enforcement officers involved in investigating Defendant's suspected drug trafficking. (Doc. 29 at 23). Members of the Cincinnati Narcotics Unit and Norwood Drug Taskforce later returned to 4613 McNeil to seize Defendant's cell phone, for which Ms. Warren signed a consent form, allowing the officers to search and retrieve the cell phone from inside the home. Law enforcement subsequently obtained a warrant to search the contents of Defendant's cell phone, and the search warrant was supported by an affidavit explaining the cell phone's possible connection to drug trafficking, with specific reference to the drug seizure from the duffel bag.

However, during the suppression hearing, Special Agent Greer, who was present during Defendant's arrest, testified that he was not aware of the duffel at any time during execution of the arrest warrant, and that he did not know of any officer who actually observed Defendant throw the bag onto the roof. (*Id*. at 29). Rather, the officers who were positioned in the backyard observed Defendant "at the second-story window" and, believing that Defendant intended to flee, ordered Defendant to stop, at which point Defendant retreated away from the window. (*Id*.; Def. Ex. B at 5). Agent Greer further testified that, to his knowledge, Defendant had not climbed out of the window when he was ordered to halt. (Doc. 29 at 30).

11

### III.  STANDARD OF REVIEW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …." U.S. Const. amend. IV.  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).  The exclusionary rule serves to deter law enforcement from obtaining evidence by unconstitutional means.  *Nix v. Williams*, 467 U.S. 431, 442-43 (1984).  So critical is the goal of deterring violations of constitutional and statutory protections that exclusion is the appropriate remedy "notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes."  *Id*. at 443.

A defendant may seek the suppression of evidence by filing a pretrial motion with the court.  Fed. R. Crim. P. 12(b)(3)(C).  "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression."  *United States v. Patel*, 579 F.App'x 449, 453 (6th Cir. 2014) (citing *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)).  However, "[t]he Government has the burden of proof to justify

a warrantless search." *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002);

*Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) ("The burden is on those seeking

the exemption to show the need for it") (quotation marks and citations omitted).

## IV. ANALYSIS

Defendant asserts that, as a frequent overnight guest at 4613 McNeil, he had a

legitimate expectation of privacy in his property. (Doc. 26). Accordingly, Defendant

argues that the warrantless search of the red duffel bag violated his Fourth Amendment

rights, and that no exception to the exclusionary rule applies. (Docs. 26, 28, 30, 33).

Defendant further argues that evidence relating to his cell phone must also be suppressed,

as law enforcement seized his cell phone without a warrant and subsequently relied on

the unlawful drug seizure to obtain a warrant to search the cell phone's content. (*Id.*)

The Government opposes suppression of the evidence for three reasons. **First**, the

Government asserts that Defendant abandoned the red duffel bag and thus had no

legitimate expectation of privacy in its contents. (Doc. 27 at 3-11; Doc. 32 at 2).

**Second**, the Government argues that the search was reasonable, based on Officer

Harrison's belief that the bag had been abandoned and that the co-residents had given

consent to search.[8] (Doc. 27 at 12-13; Doc. 32 at 3-4). And, **third**, the Government

asserts that the search of the duffel bag is subject to the inevitable discovery doctrine.

(Doc. 27 at 14-15).

---

[8] As the Court discusses, *infra*, while the Government's second argument initially appears to assert the good faith exception, the Government largely conflates authority to consent, exigent circumstances, and good faith, but neither fully elaborates nor analyzes any of the three. As such, the Court cannot confidently determine the Government's intended argument.

### A.  Abandonment

The Government does not dispute that Defendant was a frequent overnight guest of 4613 McNeil, nor that the bag belonged to Defendant.  (Doc. 29 at 5-6).[9]  Rather, the Government argues that Defendant abandoned the red duffel bag, and therefore no longer had a legitimate expectation of privacy in its content.  (Doc. 27 at 3-11; Doc. 32 at 2).

 "'The Fourth Amendment protects people, not places,' and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Minnesota v. Olson,* 495 U.S. 91, 96 n. 5 (1990) (quoting *Katz*, 389 U.S. at 351).  In that regard, "[w]hen a person has disclaimed ownership of a discarded item or container, courts have repeatedly held that the person has no legitimate expectation of privacy in the item or container and has thus abandoned it." *United States v. Dillard*, 78 F. App'x 505, 510 (6th Cir. 2003) (collecting cases).  Accordingly, "neither a warrant nor probable cause is required to seize and search property that has been abandoned." *United States v. Eden*, 190 F. App'x 416, 421 (6th Cir. 2006) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960)).

By contrast, "defendants who assert an interest in [a searched or seized] item are held not to have abandoned the item." *Dillard*, 78 F. App'x at 510 (citing *Smith v. Ohio*,

---

[9] During the suppression hearing, the Court stated that, "based on the information before [the Court] … it does not appear that anyone is contesting standing," to which both parties agreed. (Doc. 29 at 5-6).  In his post-hearing memorandum, Defendant argues that because abandonment is a question of standing, and because the Government advised the Court that standing was not at issue, the Government has waived its argument as to abandonment.  (Doc. 30 at 3-4).  The Government responds that it did not intend to waive abandonment and, instead, understood the Court to be asking about standing in all other respects.  (Doc. 32 at 1-2).  The Court clarifies that its admittedly inartful inquiry regarding standing was merely intended to memorialize that the Government did not dispute Defendant's status as a resident or frequent overnight guest, and that actual ownership of the bag was not in question.

494 U.S. 541, 543-44 (1990) ("a citizen who attempts to protect his private property from inspection … clearly has not abandoned that property")).

"Whether property has been 'abandoned,' … does not depend on where legal title rests, or whether one asserting a Fourth Amendment right has a legally enforceable possessory interest in the property…." *United States v. Oswald*, 783 F.2d 663, 666 (6th Cir. 1986) (citing *Rakas*, 439 U.S. at 143). Rather, "[i]n determining whether property has been abandoned, the Court analyzes whether the individual challenging the seizure retained a legitimate expectation of privacy in the property at the time it was seized." *Eden*, 190 F. App'x at 421 (citing *Rakas*, 439 U.S. at 143).

Defendant bears the burden to show a legitimate privacy interest in the place searched or thing seized. *United States v. Whitehead,* 415 F.3d 583, 587 (6th Cir. 2005). To satisfy this burden, Defendant must show: **first**, that he "by [his] conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private"; and **second**, that the "expectation of privacy is one that society is prepared to recognize as reasonable." *Waller*, 426 F.3d at 844. The Court must make a case-by-case determination as to whether a legitimate expectation of privacy exists in a particular place or thing. *Id*.

Notably, "[a]bandonment is primarily a question of intent, and intent m[a]y be inferred from words, acts, and other objective facts." *Dillard*, 78 F. App'x at 510 (citing *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973)). Additionally, "privacy expectations vary with the type of property involved, … [as well as] with the location of the property." *Oswald*, 783 F.2d at 666–67 (citing *United States v. Metzger*, 778 F.2d

15

1195, 1200 (6th Cir.1985)).  Indeed, "**[o]ne of the most crucial facts of an abandonment case is the location of the object in question**."  *Dillard*, 78 F. App'x at 510 (emphasis added).

Here, Defendant argues that his "actions clearly demonstrate[] his intent to protect the red duffel bag."  (Doc. 28 at 4).  Defendant asserts that the duffel bag was not thrown or carelessly tossed out the window in an attempt to disavow ownership, but was instead placed in a location where it was well-concealed from public view, was within the curtilage of the property, and was located in an area that was not accessible to the general public.  (Doc. 33 at 2-6).  The Court agrees.

Specifically, the circumstances surrounding the placement of the duffel bag support Defendant's assertion that the bag was placed outside to be <u>concealed</u>, not discarded.  The duffel bag was located on a section of the roof in the rear of the property, facing the fully fenced-in backyard, directly beneath the second-floor bedroom window, entirely invisible to passers-by, and lawfully inaccessible to the public in every respect.  Moreover, the location where the bag landed on the roof supports Defendant's contention that he did not carelessly throw the bag out of the window, but rather dropped or placed it straight down deliberately to conceal it.[10]

---

[10] The Court notes that, based on the content of the duffel and the ease with which Mr. Gore and Officer Harrison handled it, it is unlikely that the bag was particularly heavy.  Therefore, it is also unlikely that the weight of the bag would have prohibited Defendant from throwing it out farther or more forcefully, if Defendant had chosen to do so.  This observation supports the notion that Defendant's placement of the bag was deliberate, and not a scrambled effort to distance himself from it.

In *Dillard*, the Sixth Circuit addressed the issue of abandonment, citing to the case of *Commonwealth v. Straw*. *Dillard*, 78 F. App'x at 510-11 (citing *Com. v. Straw*, 665 N.E.2d 80 (1996)). *Straw* involved strikingly similar circumstances to the instant case—specifically, "the defendant had tossed a briefcase from the window of his house into his fenced backyard as police approached the house with an arrest warrant." *Dillard*, 78 F. App'x at 510 (citing *Straw*, 665 N.E.2d 80). The Sixth Circuit noted that, in *Straw*, the Supreme Judicial Court of Massachusetts held that the defendant "intended to protect his property from any public scrutiny because he placed the property in a closed and locked briefcase and disposed of the briefcase by throwing it into the fenced-in curtilage of his family's home, an area enjoying full Fourth Amendment protection from search by the authorities."[11] *Dillard*, 78 F. App'x at 510 (quoting *Straw*, 665 N.E.2d at 83). The Sixth Circuit then contrasted the circumstances in *Straw* with the Tenth Circuit case of *United States v. Morgan*, in which "Morgan fled from police to the house of an acquaintance, attempting to enter through the back door [and after being] [u]nable to gain entry into the house, the defendant 'threw the tan bag he was carrying to the south side of the porch and headed back down the porch stairs in the direction of [the police].'" *Dillard*, 78 F. App'x at 510 (quoting *United States v. Morgan*, 936 F.2d 1561, 1565 (10th Cir. 1991)). The Sixth Circuit explained that "Dillard, like Morgan (but unlike Straw, above), was not

---

[11] Although the briefcase in *Straw* was described as being "locked," it bears noting that it was only locked on one side, while "the right side latch of the briefcase was unlocked, leaving that side slightly ajar," such that the officer was able to pry the right side open further and see the contraband inside. *Straw*, 665 N.E.2d at 82. By contrast, while the duffel bag in the instant case had no locking mechanism, it was zipped shut entirely, and thus the narcotics were not visible until the duffel was opened and the contents inspected. (Harrison, 6:35).

attempting to secrete the container in a place where he had an expectation of privacy, but rather discarded the item in his attempt to avoid arrest." *Dillard*, 78 F. App'x at 511 (emphasis added). In other words, the Sixth Circuit signaled its approval of *Straw*'s holding—that is, where a defendant sees officers approaching to place him under arrest, the defendant's act of throwing a closed container into the enclosed curtilage of his own property was an act of protecting his privacy interest.

The same circumstances in *Straw* are present in the instant case. Moreover, nothing that is before the Court in the instant case undermines the notion that Defendant's placement of the duffel bag on a section of his home's roof, well-outside the lawful view and access of the public, was an effort "to secrete the container in a place where he had an expectation of privacy." *Id*.

Additionally, the Court rejects the Government's ongoing assertion that Defendant "exposed the bag to the public." While the Court acknowledges that the bag would have been visible to a low-flying aircraft and was visible to <u>one</u> neighbor who happened to have a window that offered a perfect vantage point, this hardly equates to the type of public exposure that would automatically defeat Defendant's privacy interest in the property. Indeed, by that logic, every citizen who places an item in their backyard or on their porch has "abandoned" that item, such that law enforcement could search it at its leisure.

Moreover, the Government's cited abandonment cases are distinguishable from the instant case.[12]  For instance, the Government cites to *Dillard*; but as this Court has just discussed, the *Dillard* court effectively agreed with the *Straw* court's finding that no abandonment had occurred under remarkably similar circumstances to the instant case. 78 F. App'x at 510-11.

Moreover, the facts and circumstances in the *Dillard* case are in stark contrast to the instant case.  In *Dillard*, the defendant was standing in the driveway of his apartment complex when police officers approached with a search warrant.  *Id*. at 507.  Upon seeing the officers, Dillard, who "had been holding [a briefcase] in his right hand[,] threw it to the left … [and the officers testified that] the briefcase 'went flying' and landed about four feet away."  *Id*.  Dillard then engaged in a struggle with the officers, during which Dillard used his (now free) right hand to pull a loaded 9mm firearm from him waistband. *Id*.  The Sixth Circuit found that Dillard had abandoned the briefcase, because he discarded the briefcase in an effort to better position himself to resist arrest.  *Id*. at 511 ("when a person discards an item as part of an attempt to resist arrest, courts have repeatedly found that the person abandoned the item").  In the instant case, however, Defendant did not throw his bag away from him and onto a public access way—he put

---

[12] One overarching distinction is that, in nearly all of the Government's cited cases, the district court had before it some evidence regarding the circumstances surrounding the items "abandonment," such as a witness who saw the defendant handling or discarding the bag, or a statement from the defendant either claiming or disavowing ownership.  Such evidence is relevant to the question of the defendant's intent and whether the defendant maintained a legitimate expectation of privacy in the item.  Here, however, none of the officers involved in executing the arrest warrant actually witnessed Defendant place the bag outside the window.

the bag on the roof of his own residence, entirely out of public view and access. Additionally, there is no evidence to suggest that Defendant tossed the bag because it was somehow hindering an attempt to flee or to face off with law enforcement.[13] Thus, the facts in *Dillard* are distinguishable and do not support the Government's position.

The Government also cites to *United States v. Park*, No. 96–6342, 1998 WL 69028 (6th Cir. Feb. 9, 1998) (unpublished). In *Park*, law enforcement arrived to execute an arrest warrant for the defendant, at which point the defendant's dog began to bark and alerted the defendant of the officers' presence, and "[o]ne of the deputies then saw Park lean out the back door of the mobile home, look around, and throw to the ground what turned out to be a thermos bottle wrapped in black electrical tape." 1998 WL 69028 at *1. After the officers arrested Park, they retrieved and opened the thermos, revealing that

---

[13] Even if Defendant had thrown the bag on the roof during a thwarted attempt to flee out of his window, the evidence still supports the finding that Defendant did not abandon the item. Specifically, during the execution of the warrant, Defendant was seen near the window (above where the bag was located), at which point the officers in his backyard spotted him and, believing that Defendant would flee, ordered him not to halt (*i.e.*, not climb out the window)—an order with which Defendant complied. And, as this Court previously noted (n. 6, *supra*), because of the way the window was opened, climbing through the window required considerable effort and likely could not be done while simultaneously holding onto a duffel bag. Rather, as demonstrated by Mr. Gore on the body camera footage, the more logical approach would be to push the bag through first, and then climb out after. And, as further evidenced by Mr. Gore's retrieval of the bag, once the duffel is on the roof, the distance between the window and the rooftop hinders any effort to simply reach down and retrieve the bag again from inside the house. Thus, assuming *arguendo* that the bag was outside because Defendant pushed it out, intending to climb out after it and flee from arrest, the evidence before the Court overwhelmingly suggests that Defendant would likely have been unable to retrieve the bag again, short of climbing out onto the roof (like Mr. Gore did)—a task which would have been contrary to the officers' orders for Defendant to halt. Under such circumstances, the Sixth Circuit has made clear that abandonment does not occur when a defendant relinquishes control of an item while complying with law enforcement's instructions. *Dillard*, 78 F. App'x at 511 (noting that courts should "give the benefit of the doubt to defendants who drop items while complying with police instruction") (citing *Smith*, 494 U.S. 541; *Bryan v. State*, 760 So.2d 246 (Fla. App. 2000)).

it contained methamphetamine. *Id.* The Sixth Circuit held that Park had abandoned the thermos, because "[t]he deputies observed Park in the act of throwing the thermos away." *Id.* In contrast, in the instant case, <u>there is no evidence from any officer who actually saw</u> <u>Defendant throw the duffel bag on his roof</u>. Thus, Defendant's precise mannerisms cannot be taken into account. Moreover, Park lived in a mobile home, and mobile homes are typically unprotected on all sides, such that anything lying on the ground outside is visible and easily accessible to the passing public. Defendant's duffel bag, however, was on a discreet section of the roof, located behind his home, extending into the fenced-in backyard, entirely out of the view and access of the public. Accordingly, *Park* also fails to support the Government's argument.

The Government also cites the Second Circuit case of *United States v. Arboleda*, 633 F.2d 985 (2d Cir. 1980). In *Arboleda*, officers arrived at an apartment complex (without a warrant) in order to arrest Arboleda's brother and also to interview Arboleda. *Id.* at 987-89. The plan was for the officers to knock on Arboleda's front door, while one officer was positioned on the fire escape outside Arboleda's second-floor apartment window (in the event anyone attempted to escape). *Id.* at 987. The officer on the fire escape believed he heard a knock on the front door, at which point he saw Arboleda open the window, lean out, throw an aluminum foil package onto the ledge beneath the fire escape, and then look around before closing and locking the window. *Id.* The officer then retrieved and opened the package to find that it contained cocaine. *Id.* The Second Circuit found that "[t]here [was] no evidence that Arboleda exercised any exclusive control over the ledge, which ran along the front of the building and was accessible to

other tenants from their windows and the fire escape," nor that Arboleda had ever used the ledge in a private manner, and that, therefore, "[i]t is difficult to imagine a legitimate expectation of privacy in an open area running along the front of the second floor of a building over a street." *Id*. at 991. Thus, the Second Circuit held that while Arboleda "may have intended to retrieve the package later, by placing it in an unprotected area he had abandoned it for Fourth Amendment purposes." *Id*. Once again, these facts are in stark contrast to the instant case. Specifically, Defendant's duffel was located in an area well-outside the public's view or access. Moreover, Defendant absolutely had the authority to exclude the public from the roof, which extended out from the single-family home's second-floor bedroom window. And there is also evidence that the location was kept private, *i.e.*, short of entering the fenced-in backyard and scaling the outside of the house, or otherwise entering the home and breaking through the bedroom window, there was no way to access the location. Thus, *Arboleda* also fails to support the Government's assertion of abandonment.

In short, Defendant placed his duffel bag on the well-concealed extended roof area, beneath the rear-facing bedroom window, of his single-family residence—a location that was strictly controlled and which was neither lawfully accessible nor visible to the passing public. There is no evidence that Defendant ever disavowed ownership of the duffel.[14] There is also no evidence that Defendant deliberately chose to part with the

---

[14] The Government attempts to fault Defendant for failing to claim ownership of the bag at the time of his arrest. However, it is counterintuitive to require individuals to identify and affirmatively claim ownership over items that they are deliberately trying to conceal and keep private, particularly within the confines of their own residences.

duffel in an effort to flee or combat law enforcement. Rather, all evidence leads to the logical conclusion that Defendant attempted to exclude law enforcement's access to the duffel bag by keeping it in a location over which he had a reasonable expectation of privacy (*i.e.*, a private, concealed, and publicly inaccessible area outside the bedroom window of his home). Thus, Defendant, by his conduct, demonstrated a subjective expectation of privacy.

The Government's final argument for abandonment is that, even if Defendant has exhibited an expectation of privacy, it is not one that society is prepared to recognize. (Doc. 27 at 7-11) (citing *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 544 (6th Cir. 2003)). The Government cites to a number of cases in support of the accurate proposition that society would not recognize a reasonable expectation of privacy in an item that a defendant discarded in an effort to resist arrest. (*Id.*); *see*, *e.g.*, *Dillard*, 78 F. App'x at 511, n.1 ("even if Dillard had a subjective expectation of privacy in the discarded briefcase, society would not recognize such an expectation as reasonable under the circumstances (*i.e.*, where the suspect throws a bag so as to place himself in a better position to attack police officers")). But the Government then argues that this same proposition applies in the instant case, because "society would not think any expectation of privacy is reasonable under these circumstances, *i.e.*, where [Defendant] threw a bag on the roof to place himself in a better position while resisting commands for him to surrender when SRT had a valid warrant for his arrest." (Doc. 27 at 8). This argument is unsupported by the facts and evidence in this case and misconstrues the cited law.

First, the Government fails to explain how placing the bag on the roof could logically serve the purpose of "plac[ing] [Defendant] in a better position" to <u>not</u> surrender to law enforcement. After placing the bag on the roof, Defendant hid in a closet until law enforcement located and arrested him. But Defendant could just as easily have hidden in the closet (or anywhere else, for that matter) *without* throwing the bag on the roof. Indeed, even if the bag was obstructing Defendant's intended hiding spot (an assumption for which there is no evidentiary support), the Government still fails to explain why Defendant would elect to undertake the arduous task of removing a windowpane and putting the bag on the roof, as opposed to "abandoning" the bag literally anywhere else in the home. In short, the Government fails to advance any explanation in support of its argument, and the Court finds that nothing about Defendant's decision to place the bag on the roof "plac[ed] himself in a better position" to hide from arresting officers.

The Government also overreaches in equating Defendant's conduct of hiding in a closet with someone who either attacks officers or flees from arrest. The logic of the *Dillard* court's rationale is two-fold. First, society would not find it reasonable to encourage conduct that serves no purpose other than making it easier for a suspected criminal to risk the safety of the public or police officers. And, second, when faced with the choice of either holding onto personal property or more-efficiently evading arrest, anyone who deliberately opts to engage in the latter has knowingly forfeited the former. But neither of these two explanations fits the circumstances presented in the instant case. Defendant's act of evasion (*i.e.*, hiding in a closet), while not advisable, is hardly on the same scale as violently attacking officers or actively fleeing into the community.

In short, Defendant's act of hiding the duffel did <u>not</u> facilitate his evasion of arrest—it was, quite literally, an act of protecting his property from intrusion. And this Court finds that society would find it reasonable to recognize a privacy interest in the items that we hide within the secured confines of our own properties.

Accordingly, the Court finds that Defendant maintained a reasonable expectation of privacy in the duffel bag and, thus, the bag was not abandoned.

## B. Reasonableness of the Search & Good-Faith Exception

The Government argues that, even if this Court were to find Defendant had not abandoned the duffel bag, the search must nevertheless be upheld because "Officer Harrison reasonably believed that [Defendant] had abandoned the duffel bag while resisting SRT's attempts to arrest him … [and] also reasonably believed that the remaining adult residents consented to him taking the bag." (Doc. 27 at 12).[15] As this

---

[15] The Government initially appears to offer a good-faith exception argument in the alternative. (Doc. 27 at 11) ("Even if Tapia could successfully show that he had not abandoned the bag, nor that the residents of 4613 McNeil Avenue could give consent to the search, the search should nonetheless be upheld…"). But the Government's argument immediately switches from a good-faith argument (*i.e.*, an unreasonable search caused by an officer's reasonable error) to the argument that the warrantless search actually was reasonable (which would imply the applicability of an exception to the warrant requirement). However, in support of its argument that the search was reasonable, the Government merely mentions consent and exigency, without offering any elaboration on the exceptions' legal applicability. Instead, the Government circuitously asserts, again without elaboration, that the search was reasonable because Officer Harrison reasonably believed he had consent to search the bag (which appears to implicate apparent authority to consent) and further asserts that Officer Harrison reasonably believed the bag was abandoned and posed a risk to public safety (which goes back to a good-faith argument, although it could also be interpreted as exigent circumstances). Ultimately, "[t]he Government has the burden of proof to justify a warrantless search." *Haynes*, 301 F.3d at 677. And the Government's arguments and evidence fail in that regard. Nevertheless, the Court will be responsive to the various possible interpretations of the Government's arguments, and will address the applicable law as to each exception within the broader context of good-faith.

Court will further elaborate, however, a central theme in the Government's argument is that Officer Harrison reasonably believed the search was lawful, based on all of the facts and circumstances surrounding Defendant's arrest and the ongoing drug trafficking investigation. **But the Court must emphasize that Officer Harrison, by his own** **repeated admissions, had absolutely no knowledge of any of the facts that the** **Government claims formed the basis of his beliefs**. Moreover, at no point has Officer Harrison represented to this Court that he was acting on the beliefs that the Government now confers upon him. Officer Harrison has, in this Court's opinion, always honestly conveyed the limited scope of his knowledge and involvement in this case. It is solely the Government that continues to take enormous liberties in its representations.

To start, the Government's argument, that "Officer Harrison reasonably believed that [Defendant] had abandoned the duffel bag while resisting SRT's attempts to arrest him," is factually inaccurate and unsupported by the record. As this Court has already explained, *supra*, Officer Harrison <u>repeatedly</u> stated on his body camera footage that he knew nothing of Defendant's arrest when he arrived at 4613 McNeil, and Officer Harrison confirmed this during his testimony. (*See* Doc. 29 at 12, 15, 18). Additionally, while the co-residents advised Officer Harrison that Defendant was arrested earlier that morning and that the duffel bag likely belonged to him, the co-residents offered no specific information regarding the reason for the arrest or any of the surrounding circumstances beyond the use of the flashbangs. Indeed, nothing about what the co-residents told Officer Harrison could have logically led, as the Government asserts, to the definitive conclusion that Defendant "abandoned the duffel bag while resisting SRT's

attempts to arrest him." Nor has Officer Harrison himself ever claimed to have reached such conclusions. Thus, the Court rejects, outright, the Government's attempt to confer upon Officer Harrison any facts that he did not know and any inferences that the Government claims to have been drawn from these facts.

Additionally, the Government's argument that Officer Harrison "reasonably believed that the remaining adult residents consented to him **taking** the bag," entirely misses the point of Defendant's asserted constitutional violation. (*Id.*) (Emphasis added). It is not the taking of the bag, but the warrantless search of the bag that is at issue. Indeed, had Officer Harrison merely taken the bag and secured it so that law enforcement could try to obtain a search warrant, the outcome of this case may very well have been drastically different. *See United States v. Place*, 462 U.S. 696, 701 (1983) ("Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents…").

Moving past the preliminary inaccuracy of the Government's assertions, however, the Court will consider the crux of the Government's argument, and the Court will do so within the framework of Fourth Amendment reasonableness and good faith. But, in an effort to bring some clarity to the Government's position, the Court will address the Government's arguments regarding "reasonableness" primarily as invoking an exception to the warrant requirement, and then will summarize the entirety of the good-faith exception separately.

27

The Government argues that Officer Harrison reasonably believed he had consent to search the duffel bag (although Officer Harrison himself has never actually made such a claim). (Doc. 27 at 12-13). The Government also appears to imply that Officer Harrison reasonably believed that exigent circumstances necessitated the search of the allegedly "abandoned" bag of drugs (but Officer Harrison has only claimed that the presence of the bag was suspicious and that his experience led him to conclude it may be contraband). (*Id.* at 13; Doc. 32 at 3-4). The Court will address the Government's assertions in turn and will consider the merits of the warrant exceptions (although the Government has not sufficiently asserted any such exceptions), in conjunction with whether it would have been objectively reasonable for an officer to have relied on those exceptions (which Officer Harrison has never actually claimed to have done).

### *1. Authority to Consent*

"Consent [is] a 'specifically established exception[ ] to the requirements of both a warrant and probable cause' … [and] is constitutionally sufficient" *United States v. Eastman*, 645 F. App'x 476, 479 (6th Cir. 2016) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). In a co-habitation setting, officer may rely on the consent to search given by an individual who has actual or apparent common authority over the place to be searched or thing to be seized. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008) (citations omitted). Notably, however, "**authority to consent to the search of [a common area] does not necessarily extend to the search of containers in the [common area]**." *United States v. Cork*, 18 F. App'x 376, 383 (6th Cir. 2001) (emphasis added).

In short, "[a] valid consent to search [a] closed container must come from one who has common authority **over the effects sought to be inspected**, one who has mutual use of the property, and one who generally has joint access or control for most purposes." *Waller*, 426 F.3d at 845 (citing *United States v. Karo,* 468 U.S. 705, 725-26 (1984)) (emphasis added). The government bears the burden of establishing the effectiveness of a third party's consent. *Waller*, 426 F.3d at 845 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).

Here, it bears noting at the outset that consent cannot reasonably be applicable in this case, because **Officer Harrison never actually asked for nor did he ever receive the co-residents' consent to search the duffel**. Rather, after the bag was retrieved, Officer Harrison took custody of it and brought the bag outside, at which point he asked the co-residents: "Is there anything strange that would be in this bag?" (Harrison, 06:23). Ms. Gore responded: "We have no idea; that's not our bag—that is his [Defendant's] bag." (*Id*. at 06:26) Officer Harrison then stated: "That's fine; I just want to ask before I open it." (*Id*. at 06:33). Officer Harrison then placed the duffel bag on the ground, unzipped it, and began to search. Because consent was neither sought nor given, it would be objectively unreasonable for any officer to assume that the search was authorized by consent.

Additionally, as this Court explained, *supra*, none of the co-residents actually ever consented to Officer Harrison retrieving or taking custody of the bag prior to the search. And, even assuming Officer Harrison interpreted the co-residents' mere compliance as

consent,[16] any consent allowing Officer Harrison to search <u>for</u> the bag does not equate to consent allowing Officer Harrison to search <u>in</u> the bag. *See, e.g.*, *Cork*, 18 F. App'x at 383; *Waller*, 426 F.3d at 845. Thus, under the circumstances, where even the consent to search *for* the bag was not expressly given (and by all accounts unreasonable to assume), there would have been no objectively reasonable basis upon which to infer that a further intrusion was authorized.

Despite the clear lack of consent here, the Court will nevertheless assess whether it would have been reasonable for Officer Harrison to assume that the co-residents had either actual or apparent authority to consent in the first instance.

### a. Actual Authority

Actual common authority refers to:

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Caldwell*, 518 F.3d at 429 (quoting *United States v. Matlock*, 415 U.S. 164, 171 n. 7 (1974)).

---

[16] Consent to search is only valid if it was freely and voluntarily given. *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (citing *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968)). "'It is the Government's burden, by a preponderance of the evidence, to show <u>through 'clear and positive testimony'</u> that [] valid and voluntary consent to the search was obtained." *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999) (collecting cases) (emphasis added); *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). <u>Consent must have been the product of more than mere acquiescence</u> or submission to law enforcement's demands or authority. *United States v. Canipe*, 569 F.3d 597, 602-04 (6th Cir. 2009).

Here, there is no question that the co-residents did not have actual authority to consent to the search of the bag. As this Court previously noted, *supra*, the body camera footage shows the co-residents, throughout the entirety of their interactions with Officer Harrison, expressly disclaimed any ownership or knowledge of the duffel bag. The co-residents told Officer Harrison that they knew nothing about the bag's existence, they did not know the bag was on the roof, they had never seen the bag before, and they did not own the bag.

Because the co-residents disclaimed all ownership or even knowledge of the bag, they could not have had "mutual use" of the bag nor "joint access or control." *See Caldwell*, 518 F.3d at 429. Given the totality of these circumstances, it would have been objectively unreasonable for an officer to assume that any of the co-residents had actual authority to consent to the search the bag. And, therefore, even assuming that any of the co-residents had consented (which they did not), reliance on that consent would have been objectively unreasonable.

### b. Apparent Authority

"The apparent-authority doctrine excuses otherwise impermissible searches where the officers conducting the search 'reasonably (though erroneously) believe that the person who has consented' to the search had the authority to do so." *United States v. Taylor*, 600 F.3d 678, 681 (6th Cir. 2010) (quoting *Rodriguez,* 497 U.S. at 186). The reasonableness of an officer's belief is judged objectively, based on the information known to the officers at the time. *United States v. Purcell*, 526 F.3d 953, 963 (6th Cir. 2008) (citing *Rodriguez,* 497 U.S. at 188). "Where the circumstances presented would

cause a person of reasonable caution to question whether the third party has mutual use of the property, 'warrantless entry without further inquiry is unlawful.'" *Waller*, 426 F.3d at 846 (quoting *Rodriguez,* 497 U.S. at 188-89).

Here, as previously stated, the co-residents repeatedly told Officer Harrison that they did not own the bag and they knew nothing about it. And, significantly, Officer Harrison tells the residents that he believes them. (Harrison, 11:04-11:14). Moreover, during his testimony, Officer Harrison confirmed under oath that he believed the co-residents when they disclaimed ownership and knowledge of the bag. (Doc. 29 at 15, 22). Officer Harrison further testified that when the co-residents stated the bag likely belonged to "him," Officer Harrison did not know that "him" referred to Defendant. (*Id.* at 15). And Officer Harrison never sought clarification regarding the bag's owner.

Thus, the evidence unquestionably shows that, at the time of the search, Officer Harrison did not know who the bag actually belonged to, but that he was confident in his belief that the co-residents neither owned nor knew anything about the duffel. Under these circumstances it would have been unreasonable for any officer to assert that the co-residents appeared to have authority to consent to the search.

### 2. *Exigent Circumstances*

The Government also appears to assert in passing that Officer Harrison acted reasonably because the bag contained dangerous drugs and needed to be removed from the home. (Doc. 27 at 13). Specifically, the Government states that:

> [T]here were children living and present at 4613 McNeil …
> [and] [g]iven [Defendant's] drug trafficking activities, it was
> reasonable for the adult residents of the home to want the bag

> searched and, if dangerous items were inside, removed …
> [which] is precisely what happened here: Officer Harrison
> removed a potentially lethal threat to the young children of the
> house when he seized the unlocked duffel bag containing
> fentanyl and cocaine.

(*Id*.)

Thus, the Government does not expressly argue that there were exigent circumstances present. Rather, the Government appears to imply that because the removal of the bag was ultimately in the co-residents' best interests, they would have consented to it (although this Court has already concluded they would have had no authority to do so), and that everything worked out for the best, so, effectively, the ends justified the means. In any event, in the interest of ensuring that the Court has addressed any possible argument the Government may be attempting to make, the Court will address exigent circumstances as well.

"It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez,* 540 U.S. 551, 559 (2004)). However, "this presumption may be overcome in some circumstances because 'the ultimate touchstone of the Fourth Amendment is reasonableness … and, [a]ccordingly, the warrant requirement is subject to certain reasonable exceptions." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citations omitted). "One well-recognized exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Id*. at 460 (quoting *Mincey v. Arizona,* 437 U.S. 385, 394 (1978)).

33

"In general, exigent circumstances exist when 'real immediate and serious consequences' would certainly occur if a police officer were to 'postpone[ ] action to get a warrant.'" *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 751 (1984)). The Sixth Circuit has "identified the emergency situations giving rise to the exigent circumstances exception to the warrant requirement as (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, or (4) a risk of danger to the police or others." *Id.* (citing *United States v. Williams,* 354 F.3d 497, 503 (6th Cir. 2003)). "[T]he government bears a 'heavy burden' of proving exigency. *Id.* (quoting *Welsh,* 466 U.S. at 749–50).

Here, the only exigency could arguably have been the "risk of danger to the police or others." *See id.* Further, the Court acknowledges Officer Harrison's testimony that: "Generally when I've seen things thrown on the rooftops, it's always some sort of contraband. It's usually dangerous." (Doc. 29 at 11). And the Court also acknowledges that, if there was a genuine concern (or better yet, probable cause to believe) that the duffel bag may contain drugs, it was certainly in the interest of everyone's safety for Officer Harrison to takes reasonable, lawful steps to mitigate the risk of harm.

However, the critical distinction in this case, as the Court has previously noted, is that there is a difference between merely securing the bag pending a warrant or other authorization to search, and actually searching the bag, on the spot, without a warrant or consent. "Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to <u>permit seizure of the property, pending</u>

34

issuance of a warrant to examine its contents…."  *Place*, 462 U.S. at 701 (emphasis added).

Here, Officer Harrison was called to the 4613 McNeil in response to a 911 call, during which the caller conveyed to the 911 dispatcher that there was a red duffel bag on the roof of 4613 McNeil, that a "raid" had occurred at the home earlier that morning, and that "there's been a lot of drug dealing on this street."  (Gov. Ex. 1).  However, in calling Officer Harrison to the scene, the dispatcher did not accurately convey this information. Rather, Officer Harrison was told that one of the neighbors had called 911 to report that there was "something with a gun run here last night with shots fired" and that there is now a red bag on the roof.  (Harrison, 01:35-02:40).  It was not until Officer Harrison arrived at 4613 McNeil that he received some clarity on the issue—specifically, Mr. Gore told Officer Harrison that Defendant had been arrested earlier that morning (not the night before) and that law enforcement had used flashbangs during the arrest, leading Officer Harrison to conclude that the neighbors had mistaken the flashbangs used during Defendant's arrest for gunfire.  (*Id*. at 02:11 & 07:41).  Additionally, when Officer Harrison advised the co-residents of that there is a duffel bag on the roof, Ms. Gore responded by saying, "I wonder if it's his clothes."  (*Id*. at 04:37).  And while Ms. Gore used "his" to indicate Defendant, Officer Harrison testified that he did not initially know to whom the co-residents were referring.  (Doc. 29 at 15).

In short, what the evidence shows is the limited amount of information that Officer Harrison knew about Defendant at the time of the search.  For instance, he had no knowledge that a neighbor had reported a "raid" or "drug dealing."  Nor did Officer

Harrison know why Defendant had been arrested or that there was also an ongoing investigation into Defendant's suspected drug trafficking activities. And while all co-residents disclaimed knowledge of the bag, Ms. Gore indicated her suspicion that the bag contained clothes. And, in any event, Officer Harrison was not even certain as to the bag's ownership (apart from believing it did not belong to the co-residents).

Thus, as Officer Harrison confirmed in his testimony, his only reason for suspecting that the bag may contain drugs was his own prior experience with bags being tossed on roofs. And while an officer's experience is certainly relevant, that experience alone is insufficient to support a finding of exigent circumstances or to meet even the probable cause standard required to seize property pending the receipt of a warrant.

That is not to say, however, that Officer Harrison, who suspected the bag may contain drugs, was required to leave the bag in the custody of civilians and minors. Officer Harrison knew that an arrest had just occurred and that the co-residents were being cooperative. Officer Harrison also knew, and repeatedly acknowledged, that he had no information regarding the home, the arrest, or the duffel bag. Under the circumstances, Officer Harrison could have undertaken any number of minimally-burdensome factfinding tasks in order to determine whether he had any basis to conclude that the bag posed an immediate danger to the co-residents, or whether he had probable cause to seize the bag pending the issuance of a warrant. But Officer Harrison did not take the time to supplement the information he needed to make an informed and legally-sound determination regarding probable cause. Had he done so, Officer Harrison could have seized (not searched) the bag and turned it over to the investigating agency, so that

36

the officers involved in the drug trafficking investigation could either obtain a warrant or, alternatively, return the bag to the co-residents. In short, just taking basic precautions— *i.e.*, asking preliminary questions before conducting a warrantless search on a whim— would have ensured compliance with the mandates of the Fourth Amendment while also effectively addressing any perceived exigent circumstances.

Given the limited amount of information known to Officer Harrison at the time of the search, it would be objectively unreasonable for an officer to determine that exigent circumstances necessitated intrusion into the home, let alone a further intrusion into the duffel bag. It was also objectively unreasonable for an officer to make the determination that a warrantless search of the bag is required, without expending the minimal effort to be better informed of the relevant facts and circumstances of the situation. Moreover, even if Officer Harrison had made preliminary inquiries and gathered additional information, it was objectively unreasonable to undertake an on-sight search of the duffel bag rather than seizing the bag pending a lawful search.

### 3. Good-Faith Exception

Having considered the totality of the circumstances surrounding Officer Harrison's search of the duffel bag, and having concluded that a Fourth Amendment violation has occurred, and that the violation arose from objectively unreasonable conduct, the Court must nevertheless consider whether exclusion is indeed warranted.

"The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). Indeed, "[t]he Fourth Amendment

contains no provision expressly precluding the use of evidence obtained in violation of its commands …." *United States v. Leon*, 468 U.S. 897, 906 (1984). And the Supreme Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Herring*, 555 U.S. at 141 (noting that "exclusion 'has always been our last resort, not our first impulse'" (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

The "'prime purpose' of the exclusionary rule 'is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.'" *Illinois v. Krull*, 480 U.S. 340, 347 (1987) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). Accordingly, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. The Court must therefore make a case-by-case determination and grant suppression "only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon*, 468 U.S. at 918.

In short, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144. And, therefore, "<u>evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional</u> under the Fourth Amendment.'" *Krull*, 480 U.S. at 348-49 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975) (emphasis added)).

Although warrantless searches are presumptively unreasonable under the Fourth Amendment, "this presumption may be overcome in some circumstances because 'the ultimate touchstone of the Fourth Amendment is reasonableness.'"  *King*, 563 U.S. at 459 (quoting *Brigham City*, 547 U.S. at 403).  Thus, "[t]he ordinary requirement of a warrant is sometimes supplanted by other elements that render the unconsented search 'reasonable.'"  *Rodriguez*, 497 U.S. 177, 185 (1990).  "[I]n order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable."  *Id.*

In short, "[b]ecause many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part.  **But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions**…."  *Id.* at 186 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)) (emphasis added).

As the Government notes, this Court addressed Officer Harrison following his testimony at the suppression hearing, and the Court told Officer Harrison: "Before you step down, this is a legal question as to whether or not a warrant should have been obtained, but I am compelled to tell you as a long-time, experienced judge that I thought you treated the citizens with respect and courtesy, and that's a credit to you."  (Doc. 29 at

24).  And the Court stands by that statement.  Officer Harrison maintained a kind and respectful demeanor throughout his interactions with the co-residents, and that is a quality that, unfortunately, is at times lacking in in other law enforcement interactions. Officer Harrison's manner in interacting with citizen is a credit to him.  But, regrettably, this search was not.  And the question before the Court is not whether the officer is a nice guy, but whether a Fourth Amendment violation has occurred and, if so, whether the violation was the result of a reasonable misstep or, rather, an unreasonable abandonment of constitutional safeguards that must be deterred.  In this instance, the Court cannot find that the errors were objectively reasonable or sufficiently negligible.

It is fair to say that the tone of this search did not bear the heavy-handed hallmarks that courts have come to associate with the exclusionary rule.  But in some ways, casualness of the search makes the departure from constitutional guarantees all the pernicious.

As this Court has already summarized, the case law is clear that the Court is to take into account the difficulty officers face in making decisions, particularly in high-pressure and ambiguous situations.  Thus, the Court must leave reasonable room for error.  But, in the instant case, an officer was faced with cooperative individuals, in a relatively calm environment, and he had the opportunity to take the time to think and act within the confines of the Fourth Amendment.  He did not do so.  Moreover, this is not a situation in which an officer was bombarded with information that he, in hindsight, assessed incorrectly.  Rather, the officer had virtually no information relevant to the task at hand, and moreover, he knew that he did not have the relevant information, yet he

made no effort to procure it before undertaking a warrantless search. Instead, he made the deliberate decision to forge ahead, without even making the most basic inquiry (*e.g.*, "What was the name of the man who was arrested?"; "Why was he arrested?"; "Why might this bag have ended up on the roof?").[17] The entirety of Officer Harrison's time at 4613 McNeil, from the moment he pulled up in his car to the moment he left with a duffel bag of drugs, took less than 17 minutes. Expecting officers to take a few minutes longer and invest a modicum of effort, particularly where there is no hinderance to such an effort, is not an overly-burdensome request in exchange for ensuring that law enforcement respect the sanctity of a person's constitutional rights. The violations of these rights can never be effectively restored, which is precisely why deterrence is so critical. *See United States v. Calandra*, 414 U.S. 338, 347 (1974) ("[t]he purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim: '[T]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late'") (quoting *Linkletter v. Walker*, 381 U.S. 618, 637 (1965)).

In short, this Court cannot find good-faith where an officer knowingly enters a person's property without consent (first the fenced-in backyard and then the actual house), takes a duffel bag and effectively seizes it without permission, searches it without

---

[17] By this Court's computation, Officer Harrison left 4613 McNeil at roughly 8:07 a.m. And, as discussed in Section D, infra, after Officer Harrison seized the duffel bag of drugs, the Norwood Police Department contacted the Narcotics Officers involved in Defendant's underlying investigation. The Narcotics Officers then retrieved the duffel from Norwood, inspected the contents, and were back at 4613 McNeil to search for Defendant's cell phone by 10:33 a.m. In other words, the Narcotics Officers were clearly keen to act on the new evidence and did so with minimal hesitation. Thus, if Officer Harrison had called his department and asked to get in touch with the Narcotics Officers before conducting the search, the Narcotics Officers would likely have been promptly responsive.

any authorization, and does all of this based on nothing more than a convoluted 911 dispatch and an anecdotal history of finding drugs on people's roofs. Officer Harrison did not make a reasonable mistake with the information he was given because he had no relevant information to start with and he knew it. But rather than gathering the relevant information first, he chose to shortcut without it, despite the constitutional implications of his conduct. And a violation of the Fourth Amendment for no reason at all is, in this Court's opinion, as worthy of deterrence as a violation based on ill-intent.

The Court finds the search was objectively unreasonable and the deficiencies were sufficiently reckless, if not "deliberate," to require deterrence and warrant suppression. *See Herring*, 555 U.S. at 144.

### C. Inevitable Discovery

The Government also argues that, had Defendant maintained physical custody of the duffel bag, then the search of the duffel bag would have been inevitable as part of a search incident to arrest. The Court finds that the Government misconstrues the inevitable discovery doctrine and, therefore, the exception does not apply.

"Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Nix v. Williams*, 467 U.S. 431, 446 (1984). Accordingly, the inevitable discovery doctrine, "allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *Kennedy*, 61 F.3d at 497 (citing *Nix*, 467 U.S. at 444). The application of the inevitable discovery exception cannot place the prosecution in a better position than it would have been in if

42

the improper conduct had not occurred, nor should the prosecution be placed in a worse position as a result of law enforcement error. *Nix*, 467 U.S. at 443. The evidence is, therefore, admissible when it "would inevitably have been discovered without reference to the police error or misconduct, [as] there is no nexus sufficient to provide a taint." *Id*. at 448. The Sixth Circuit recognizes that "the existence of a routine procedure… satisfies the requirement that there be compelling facts illustrating that the disputed evidence inevitably would have been discovered." *Kennedy*, 61 F.3d at 500.

The Government's argument that the duffel would have inevitably been discovered as part of a search incident to arrest has no merit. In short, a search incident to arrest is an exception to the warrant requirement that permits law enforcement, <u>in the course of executing a lawful arrest</u>, to also conduct a warrantless search of the arrestee's person "and the area 'within his immediate control'… from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969); *see also Arizona v. Gant*, 556 U.S. 332, 338 (2009). And the inevitable discovery doctrine applies in circumstances where, as the name suggests, the discovery would have been <u>inevitable</u>, *i.e.*, " incapable of being avoided or evaded." *See* <u>Inevitable</u>, Merriam-Webster, available at: https://www.merriam-webster.com/dictionary/inevitable (last visited on Apr. 27, 2022).

To start, the only possible way for the duffel bag to have been swept up in a search incident to arrest would have been if Defendant were inexplicably hiding in the closet and clutching onto the duffel when officers arrested him, or if Defendant had left the duffel

out within the area of his immediate control. But none of this occurred. The bag was on the roof, well-outside Defendant's reach and, critically, <u>unknown to the officers</u>.

More to the point, however, Defendant was arrested **prior to** Officer Harrison's search of the duffel bag. Thus, it is quite literally impossible for a search incident to arrest to have been inevitable because the arrest had **already occurred**. Thus, the Government's argument is not only a legal misconception but an absolute impossibility.

### D. Suppression of Derivative Evidence

Finally, Defendant argues that his cell phone and the cell phone's content must also be suppressed as "fruit of the poisonous tree," because law enforcement obtained said evidence by relying on the unlawful drug seizure.

To establish whether the cell phone search constitutes derivative evidence of the unlawful search of the duffel bag, the Court must consider whether law enforcement relied upon the drugs found in the duffel in order to later seize the cell phone or obtain a warrant to search the cell phone's content. To that end, it is important to keep in mind that, while Defendant was arrested for unlawfully re-entering the United States, he was also under investigation for potential drug trafficking. The investigation into Defendant's alleged drug trafficking is thoroughly detailed in the DHS investigative report. (Def. Ex. B). Additionally, the affidavit in support of Defendant's arrest warrant—which affidavit was prepared <u>prior</u> to Officer Harrison finding the drugs in the red duffel bag—contained discussion of Defendant's suspected drug trafficking activities. (Def. Ex. C).

Because officers had some evidence of Defendant's alleged drug trafficking activities, and because that evidence was obtained <u>prior to</u> the drug seizure, it is not a foregone conclusion that the drug seizure led to the seizure and search of the cell phone.

### 1. Seizure of the Cell Phone

As an initial matter, the Court notes that the seizure of the cell phone from 4613 McNeil occurred pursuant to a consent search. Specifically, Ms. Warren signed a consent form, allowing law enforcement to enter 4613 McNeil to retrieve the cell phone. And Defendant has not proffered any argument or evidence to dispute the validity of Ms. Warren's consent. Because Defendant does not advance any argument as to the validity of the consent search, and based upon the evidence of record, the Court concludes that the consent search itself was lawful.

The remaining question is whether law enforcement would have returned to 4613 McNeil to seize the cell phone if not for the unlawful drug seizure. In that regard, the Court has before it the warrant and supporting affidavit that law enforcement obtained in order to search the content of Defendant's cell phone. The affidavit states that Narcotics Officers were quickly advised of Officer Harrison's search and the resulting drug seizure, at which point Narcotics Officers retrieved the duffel bag from Norwood Police and inspected the contents, confirming the suspicion that the bag likely contained illegal narcotics. The Narcotics Officers then returned to 4613 McNeil by 10:33 a.m. that same morning (September 13, 2019), and conducted a consent search, resulting in the seizure of Defendant's cell phone.

The sequence of events, as set forth in the affidavit, indicates that law enforcement returned to 4613 McNeil to search for the cell phone based <u>solely</u> on the new information relating to the drug seizure.[18]   Accordingly, while Ms. Warren's consent to search was valid (or at least undisputed), the evidence before the Court suggests that the search for the cell phone was prompted entirely by the discovery of evidence obtained from the unlawful drug seizure.

Therefore, the cell phone seizure constitutes derivative evidence and must be suppressed.

### 2. Search Warrant for Contents of the Cell Phone

Similarly, whether the content of the cell phone should be suppressed as "fruit of the poisonous tree" depends upon whether the affidavit used to obtain the cell phone search warrant relied upon the unlawful drug seizure.  And, as previously noted, the drug seizure was in fact discussed in the search warrant affidavit.

Accordingly, the search of the cell phone's content also constitutes derivative evidence and must be suppressed.

---

[18] The Court cannot discount the possibility that the timing of the drug seizure and Narcotics Officers returning to retrieve the cell phone is simply coincidental.  For instance, it is possible that law enforcement was planning to return to 4613 McNeil regardless, after realizing that Defendant was not in possession of his cell phone when he was arrested.  But such a finding would require additional testimony from the investigating officers.

## V.  CONCLUSION

Based upon the foregoing, Defendant's motion to suppress (Doc. 26) is

**GRANTED.**  Accordingly, the drugs seized during the unlawful search of Defendant's

duffel bag shall be suppressed, along with any derivative evidence arising from the search

of Defendant's cell phone.

**IT IS SO ORDERED.**

Date:  5/10/2022

Timothy S. Black
United States District Judge

47